Filed 6/14/16  In re Felix N. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION SEVEN

| | |
|---|---|
| In re FELIX N., a Person Coming Under the Juvenile Court Law. | B265695 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> JOSE N., <br><br> Defendant and Appellant. | (Los Angeles County <br><br> Super. Ct. No. DK03695) |

APPEAL from an order of the Superior Court of Los Angeles County, D. Zeke Zeidler, Judge.  Affirmed.

Christy C. Peterson, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Keith Davis, Acting Assistant County Counsel, and Navid Nakhjavani, Deputy County Counsel, for Plaintiff and Respondent.

_____

# INTRODUCTION

Jose N., the father of two-year-old Felix N., appeals from the juvenile court's order terminating his parental rights. Jose contends the juvenile court erred in concluding he had not established the parent-child beneficial relationship exception to the termination of parental rights provided by Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)(i).[1] We affirm.

# FACTUAL AND PROCEDURAL BACKGROUND

A.      *Detention, Jurisdiction, Disposition, and the Six-Month Review*[2]

Felix was born in September 2013. On February 10, 2014 the juvenile court authorized the Los Angeles County Department of Children and Family Services to detain Felix from his parents, Jose and Ashley H. The Department filed a petition alleging that Felix was in danger of serious physical harm as a result of "violent altercations [between Jose and Ashley] in the presence of [Felix]" (§ 300, subds. (a) and (b)); abuse of marijuana by Jose and Ashley while caring for Felix (§ 300, subd. (b)); and the effects of Ashley's "mental and emotional problems," from which Jose failed to protect Felix (§ 300, subd. (b)). At the detention hearing on February 18, 2014 the court found a prima facie case for detaining Felix from Ashley, but released Felix to Jose over the objections of counsel for Felix and the Department. The juvenile court ordered Jose and Ashley "not to have contact with each other," and ordered Jose not to be present during Ashley's monitored visits with Felix. Nevertheless, on March 26, 2014 Ashley

---

[1]      Statutory references are to the Welfare and Institutions Code.

[2]      Because Jose does not challenge any of the court's decisions before the section 366.26 hearing, and because much of the factual and procedural background is not relevant to the appeal, we include only a brief summary of the facts of the case. As Jose concedes in his reply brief, this appeal involves "neither [Felix's] return nor reinstatement of reunification services."

signed an affidavit in front of a Department social worker stating that she lived with Jose and Felix after the detention hearing (from February 15, 2014 through March 24, 2014), and that Jose left Felix in her care when he left the house.

On May 22, 2014, at the Department's request, the juvenile court authorized Felix's removal from Jose. On May 27, 2014 the Department filed an amended petition with additional allegations under section 300, subdivision (b), that Jose has untreated "mental and emotional problems" that endanger Felix, and that, although the court ordered Jose not to have contact with Ashley after the February 18, 2014 hearing, Jose "encouraged [Ashley] to reside with him and [Felix], . . . thus exposing [Felix] to continued verbal and violent altercations." The court ordered Felix detained from Jose and placed with his maternal grandparents. Since May 2014 Jose has had only monitored, weekly visits with Felix for two hours each week.

On July 2, 2014, five months after the court placed Felix with his grandparents, the court held a contested jurisdiction and disposition hearing, sustained the amended petition in its entirety, declared Felix a dependent of the court under section 300, subdivisions (a) and (b), removed Felix from the custody of his parents, and ordered reunification services for both parents. Jose filed a notice of appeal from the jurisdiction findings and disposition order, but abandoned the appeal.

At the six-month review hearing (§ 366.21, subd. (e)) on January 28, 2015, the court terminated reunification services for both of Felix's parents, finding they had not made significant progress in resolving the problems that led to Felix's removal. The court scheduled a hearing pursuant to section 366.26 to select and implement a permanent plan for Felix.

B.    *The Selection and Implementation Hearing and the Termination of Jose's Parental Rights*

On July 14 and 15, 2015 the court held the selection and implementation hearing pursuant to section 366.26. Jose called three Department employees to testify. Trung Banh, a Department monitor, testified that he monitored one visit Jose had with Felix.

3

Banh brought Felix to the visiting room in the car seat he had used to bring Felix to the visit. Jose "was angry because he didn't think the car seat fit his baby." It turned out that Felix weighed one pound more than the car seat's limit. Felix left the visit in the car seat his grandmother had, which was the appropriate size for his age and weight. Banh had no opinion about whether Felix and Jose were closely bonded because the visit occurred during Felix's nap time, and Felix slept for most of the visit.

Another Department monitor, Diana Stevson, testified that she monitored Jose's visits with Felix for four months in early 2015, and that during those four months Jose missed only one visit. Stevson testified that Felix was happy to see Jose, and that Jose greeted Felix affectionately, with "a hug or a kiss or both." She said that Jose responded to Felix's needs and that she had only observed positive interactions between the two. She testified that Jose taught Felix "right and wrong" by telling him "not to put the toys in his mouth, because a lot of other kids play with them . . . and to sit down correctly so he doesn't fall," and "he encourage[d] him to eat everything." She described Jose as "patient and warm," with "a lot of enthusiasm in his tone." She said that Felix cried for three or four minutes when the visits ended. When asked to "describe the attachment the child has to his father," Stevson responded, "I would say they're strongly bonded. The interaction is well and warm, loving." On cross-examination, Stevson testified that Felix cried for the same amount of time—three or four minutes—when she picked him up from day care to take him to the visits. Stevson also testified that at the end of one visit Jose expressed concern about a bruise of "maybe a of couple inches" on Felix's leg.

Shamar McDowell, who monitored Jose's visits with Felix for the seven months before Stevson, testified that during that time Jose cancelled only three visits. She said that Felix would smile when he saw Jose and seemed happy to see him. She described Jose "interacting with [Felix] like a father would interact with a baby," "just baby talking," teaching him to walk, "assisting him with toys," and "sing[ing] to him sometimes." "If [Felix had] a scratch or a bruise, [Jose] would want [McDowell] to report that." McDowell testified that Felix often had a cold and that Jose would insist that he see a doctor. Most of the time Felix had nothing more than a common cold, but

4

on one occasion the doctor diagnosed Felix with an early stage of pneumonia and prescribed a 10-day course of antibiotics. By the next day, Felix was behaving normally.

The Department's visitation logs were consistent with the visitation monitors' testimony. For example, the notes for the December 9, 2014 visit stated that at the end of the visit Felix "started crying for father, but stopped crying shortly after." The December 23, 2014 notes stated that Felix started crying at the end of the visit, but "immediately stopped crying after a few minutes." The visitation logs also noted positive interactions between Jose and Felix. For example, the notes for the January 6, 2015 and February 10, 2015 visits stated, "Father was happy to see [Felix] and vice versa." On March 4, 2015, "[t]he visit appeared to be a pleasant experience for father and son!" The March 11, 2015 notes described Felix as "a happy child who interacts well with his father." On May 1, 2015, "[t]here was affection and good interaction between father and son." Both the visitation logs and the testimony at the hearing reflect that Felix looked to Jose to comfort him during the visits by, for example, clinging tightly to him when he saw a stranger. The notes were also consistent with the testimony about daycare, stating that Felix "smiled when he returned to daycare" and "cried when leaving the daycare staff."

Jose testified that he and Felix are "very bonded" and "have a very close relationship," which he described as "just a father/son relationship." When asked how he thought it would affect Felix if Felix never saw Jose again, Jose answered: "I think personally, as you can tell from the history and all these reports, you know, I make sure that he's okay. I try to make sure he's safe as much as I can every time I see him. And I just feel like if I'm not there, who's going to do that? You know, every single time he's had a bruise, I don't think anybody else has ever complained about it or even noticed it. I'm the only person that's like, 'this needs to be dealt with,' and it's not okay for a child to have a bruise, you know, regardless of the situation. It's just -- It's not okay. . . . That's what really the Department is here for is to protect our children. And he's coming with bruises and illnesses and, you know, I just don't agree with that protection or that form of, you know, policy to protect that child. . . ." Jose also testified that "[Felix] needs both me and his mom, as well, to show him . . . love and to be there for him."

In its report for the section 366.26 hearing, the Department assessed Felix's current caregivers (his maternal grandparents) as follows: "Mr. and Mrs. H have been married for 27 years. . . . They lead an active life consisting of hiking, gardening and traveling. The couple has a solid partnership based on mutual love, respect, trust and good communication. They are looking forward to raising Felix and exposing him to their hobbies as he gets older. Felix will grow up in a loving, happy home environment where all of his medical, emotional and developmental needs are met." According to the report, the maternal grandparents' "adoptive home study was approved. The couple is looking forward to adopting Felix and providing him with a stable and loving home." According to the Department's Concurrent Planning Assessment, Felix's maternal grandmother "stated that her grandson is the light of her and her husband's life and that they want to ensure that he has a good life with a stable home."

The juvenile court found that it was likely Felix would be adopted, and the court terminated both parents' parental rights. As to Jose, the court explained that "when it comes down to it, the reality is that the father has had two-hour monitored visits once a week, and that is the extent of it." "[A]lthough the father has shown a regular and consistent visitation and contact and even some level of parental role and relationship[], he has not shown at all that that outweighs the benefit of permanence and adoption when he's had two-hour visits once a week . . . ." The court noted that Felix's grandparents would "have discretion to permit ongoing contact with the parents." Jose's sole argument is that the court "erred when it failed to preserve the father-son relationship by applying the beneficial relationship exception to termination."

**DISCUSSION**

"At a hearing under section 366.26, the court must select and implement a permanent plan for a dependent child." (*In re K.P.* (2012) 203 Cal.App.4th 614, 620.) "[T]he court may order one of three alternatives: adoption, guardianship or long-term foster care." (*In re S.B.* (2008) 164 Cal.App.4th 289, 296.) "Where there is no

6

probability of reunification with a parent, adoption is the preferred permanent plan." (*In re K.P.*, at p. 620; see § 366.26, subd. (b) [the goal of a section 366.26 hearing is "to provide stable, permanent homes for [dependent] children"].)  Under section 366.26, "the court must terminate parental rights and free the child for adoption if it determines by clear and convincing evidence the child is adoptable within a reasonable time, and the parents have not shown that termination of parental rights would be detrimental to the child under any of the statutory exceptions . . . ."  (*In re D.M.* (2012) 205 Cal.App.4th 283, 290; see *In re S.B.*, at p. 296 ["[o]nce the court determines the child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1)"].)

Jose does not argue the juvenile court erred when it determined that there was no probability of reunification and that Felix was likely to be adopted.  Rather, Jose argues that he met his burden of showing that termination of parental rights would be detrimental to Felix under the parent-child beneficial relationship exception in section 366.26, subdivision (c)(1)(B)(i).  Under this provision, the court may decide not to terminate parental rights if it finds "that termination would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  When deciding whether to apply the parent-child beneficial relationship exception, "'the court balances the strength and quality of the natural parent/child relationship [while the child is] in a tenuous placement against the security and the sense of belonging a new family would confer.  If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.'"  (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 397; see *In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643 ["[a] beneficial relationship 'is one that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents"'"].)  Whether the parent-child beneficial

7

relationship exception applies "'must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond.'" (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1166.)

Where the juvenile court finds the parent has not established the existence of the requisite beneficial relationship, our review is limited to determining whether the evidence compels a finding in favor of the parent on this issue as a matter of law. (See *In re I.W.* (2009) 180 Cal.App.4th 1517, 1527-1528.) Where the juvenile court concludes that the benefit to the child derived from preserving parental rights is not sufficiently compelling to outweigh the benefit achieved by the permanency of adoption, we review that "'"quintessentially' discretionary decision"'" for abuse of discretion. (*In re K.P.*, *supra*, 203 Cal.App.4th at pp. 621-622; accord *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315.)

The juvenile court found that Jose "has shown . . . regular and consistent visitation and contact and even some level of parental role and relationship . . . ." The Department does not challenge this ruling.

The juvenile court determined, however, that Jose did not meet his burden to show termination of parental rights would be detrimental to Felix, explaining that Jose "has not shown . . . that [the parent-child relationship] outweighs the benefit of permanence and adoption . . . ." Jose argues that the juvenile court erred because "[he] and Felix shared a strong, positive and parental attachment and Felix would benefit from continuing the relationship." Jose asserts that he "was Felix's caregiver for seven months of his life and Felix continued to display a strong attachment to Jose throughout the dependency proceeding. During weekly visits, Felix relied on Jose to provide comfort, affection and stimulation and he cried when the visits ended. Jose was 'attuned and emotionally available' to Felix, kind and firm and understood his son's needs. Jose was also a fierce advocate for Felix's health and safety."

There is some evidentiary support for Jose's characterization of the evidence he presented at the section 366.26 hearing. Jose, however, has not shown the juvenile court abused its discretion. "To overcome the preference for adoption and avoid termination of the natural parent's rights, the parent must show that severing the natural parent-child relationship would deprive the child of a *substantial*, positive emotional attachment such that the child would be *greatly* harmed." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466; see *In re C.F.* (2011) 193 Cal.App.4th 549, 555 [to overcome the legislative preference in favor of the permanency of adoption, "a parent must show more than frequent and loving contact or pleasant visits"]; *In re Brittany C.* (1999) 76 Cal.App.4th 847, 853 ["[t]o require that the parent need only show some, rather than great, harm at this stage of the proceedings would defeat the purpose of dependency law"].) "A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive some benefit from continuing a relationship maintained during periods of visitation with the parent." (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643.)

Jose did not show that termination of his parental rights would cause Felix great harm. Felix lived apart from Jose, and only saw Jose for two hours each week, for more than a year (approximately two-thirds of his life). Although Felix cried for two to three minutes at the end of his visits with Jose, Felix cried for the same amount of time when leaving daycare. It is true that Jose acted lovingly and appropriately toward Felix, and that Felix responded positively to Jose and looked to him for comfort during the two hours each week he was with Jose. These facts, however, do not show a substantial emotional attachment such that severing the bond would cause great harm. (See *In re Jason J.* (2009) 175 Cal.App.4th 922, 936; *In re Angel B., supra*, 97 Cal.App.4th at p. 466; see also *In re J.C.* (2014) 226 Cal.App.4th 503, 530 ["a parent may [not] establish the parent-child beneficial relationship exception by merely showing the child derives some measure of benefit from maintaining parental contact"].) As for Jose's contention that Felix benefited from the relationship because Jose advocated for Felix's safety, there is no evidence to support the embedded assumption that Felix's caregivers

and potential adoptive parents were *not* equipped to advocate for his health and safety. Here, as in *In re Angel B.*, *supra*, 97 Cal.App.4th 454, "there was no hint in the record before the juvenile court that [Felix] would be harmed in any way if [his] relatively brief, albeit happy, visits with [Jose] were to end." (*Id.* at p. 468.) The juvenile court did not abuse its decision in ruling that Jose did not establish the parent-child beneficial relationship exception.

**DISPOSITION**

The juvenile court's order is affirmed.


SEGAL, J.


We concur:



PERLUSS, P. J.



BLUMENFELD, J.*

_____

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.